June 1, 2011

To:
Federal Court
Honorable Mike K. Nakagawa

RECEIVED & FILED

JUN 1  3 13 PM '11

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Re:
Case # 11-13942

Subject:
Objection to Confirmation of Chapter 11 Bankruptcy Plan

By my signature below and according to the schedule of deadlines recently set forth in the above referenced action, please allow this letter to serve as a request that I be allowed to speak at the June 21, 2011 hearing that will address the acceptance of the Disclosure Statement and the confirmation of the Plan. I vehemently OBJECT to both.

In addition, there are at least two other individuals who would also like to be heard and who live close enough to afford the time and cost of appearing. This letter is also being filed on behalf of them. Their names are Donna Durkin and Michelle Achiardi and each of us will be present on a Pro Se basis as we are not in a position to afford legal representation and no requests/offers of pro bono representation have been made/accepted.

There has been a forced fragmentation of the pool of investors -- accomplished through the blatant roadblocks that have been set up which prevent any of us from learning the identities of our fellow investors or contacting them -- and the anticipated legal fees are beyond our combined means sans the ability to "capital call" the others. Each of us, basing our decisions on false promises and flagrant misrepresentations made during the initial sales process, invested in many of these high-return "opportunities."

The three of us are all, by definition, Senior Citizens. We are unable to make sense of the word construction of the Disclosure Statement and each of us believe such wording is intentionally formulated to further confuse the future and cloak the misdeeds of the past. I was able to get some assistance from a pro bono Internet Site; dedicated individuals who donate their time and experience to victims of fraud. Fight Fraud America not only heard us, but put in hundreds of hours of investigative work to attempt to unravel what I believe was operated as a giant Ponzi scheme. The Executive Director, in a personal email to me, appears to share my viewpoint after reviewing a massive amount of documentation. Rather than attempt to restate her opinions in this cover letter, I have taken the liberty of attaching a copy of what she most recently sent me. I beg the Court to review this email and contact the writer directly if the Court deems it necessary.

Investment scams and lending fraud schemes are rampant and destroying our collective economy and the lives of those investors who trusted the validity of information provided at the time of the 'no-can-lose-on-this one' sale. We are three of those investors and we would like the Courts help so that we can locate the other estimated 2,997 and seek justice for all.

Should anything else be required to allow us to be heard in the 6/21/11 hearing, please contact me at 702-897-7346 or by email at docb156@gmail.com

Thank you in advance for your time and attention to this most critically important matter.

Dr. Robert Hamblen           Donna Durkin           Michelle Achiardi

from John Cooke leslie@johncooke.com
to docb156@gmail.com
Wed, Jun 1, 2011 6:10AM
RE: NV-2276


Dear Dr. Hamblen,

As per our phone conversation, I am sending you this updated report tonight because I understand that you are on a deadline. As is always the case with any written correspondence between Fight Fraud America and a victim, I'd like to begin by stating that I am NOT an attorney and that everything that follows is to be accepted solely as an opinion. Before you act on any information contained in this update, you should consult an attorney licensed to practice in your state. Should that legal professional wish to enter our opinion, stated as such, into the record of a legal proceeding, that would be entirely at his/her discretion. Individually, and in conjunction with my representation of Fight Fraud America, I have no objection.

At this time, Fight Fraud America has other open cases around the US, I believe in 14 states at the moment, where the tactics were strikingly similar in nature to those which you encountered. As near as I can estimate what we've thus far encountered emanating from Nevada (including projects in California and Arizona), the victim pool of approximately 3,000 investors has all but lost an amount approaching two billion dollars. That's billion with a B, not an M. The other investment pools we are looking at -- not the same as your own involvements -- add another $3 billion in estimated losses. In short, it's endemic in nature, there are no geographic boundaries, and criminal accountability has been sporadic at best. If your investor group is any indication of what the victim profile looks like, the average investor is a vulnerable senior citizen and subject to protection under specific state statutes covering matters of Elder Exploitation.

What sets this particular matter apart in my mind, is that the turnip bleeding continues as I write this. The old adage of "you can't get blood from a turnip" has been overthrown here. The last drops appear to be in the process of being sucked out, dollar by dollar, by the brazen use of the Federal Bankruptcy Courts to continue this travesty upon the elderly.

Please permit me to take some examples from the following CASE NUMBER 11-13942-mkn, that, if I understand correctly, will be in front of Judge Mike K. Nakagawa on June 21, 2011.

While there are multiple files, this particular file tells a story as well as any of them. One of many aspects of this file that astounded me -- and astounding me is exceptionally difficult after 25 years of fraud investigation experience -- is that the assigned attorney/trustee for the US Bankruptcy Court, Edward M. McDonald Jr., appeared to have wholly figured out who did what to whom, however was constrained by a lack of time and investigative resources to an extent that the Court has not yet stopped this speeding bullet that is threatening the well-being and just handling of 3,000 innocent victims.

This 44 acres of land was initially intended, so investors were told, to be used for residential development. Focus purchased it in 2004 for $2.6 million, and the tax assessor rolls reflect this valuation at that juncture in time.

The representation made to the investors by Clayton Mortgage personnel (who were in a position of trust with the elderly who are entitled to protection under Nevada law), was that this $2.3 million dollar property had a fair market value of $18 million and $20 million supported by two appraisals done in 2006. The 2nd appraisal for $20 million entered into the equation in the later stages, at a time that final investors were being persuaded to join a ship that had already begun to sink.

A major selling point was that the investment dollars were protected by a personal guarantee from multi-millionaire John A. Ritter. What they failed to advise, however, was that the guarantor signed far beyond a billion dollars worth of guarantees. While the earlier ones may have indeed been backed by tangible assets,

the later ones were so diluted as to be virtually worthless. Whomever owed a fiduciary duty to this group of investors either "knew or should have known" that this selling point was without significant worth, yet still it was offered up as a blanket of protection.

Another representation was that the borrower was going to shoulder the balance of the investment. While the "value" was clearly (or so presented) $18 and $20 million investors needed only to loan $11 million.

Monies from that investment pot over and above the cost of the land were said to being used to purchase additional parcels of land. As near as I can glean from the thousands of pages of paper in these boxes, all lands purchased by this borrower after this 44 acres ... was instead put out as bait for new/additional loan consortiums who wanted in on this 12% per annum goldmine. In the early stages, the quarterly dividends were indeed paid out, but when the new money could no longer cover the old money, the house of cards fell down.

The definition of a Ponzi scheme, from the Securities Exchange Commission, is "A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors." What I see in these papers is that investors turned over $11 million for a share (equal to their loan percentage) of a $2.3 million property, a watered down piece of paper, and a promise from those in a position of trust that "we'll take care of you."

During one of the Federal Bankruptcy Court Trustee Hearings, when Mr. DeVore, President and Chief Operations Officier. was being questioned under oath, he pointed the finger of blame at the real estate market collapse. It is my opinion/contention that the cause of making the first domino fall is not at all the actual issue. The criminality is that there were so many dominos, each put into place for sheer profit. Undeveloped land in the Las Vegas Valley did take a hit. So did homes and commercial buildings. That hit can fairly be represented within the range of 40 to 60 percent, however every single one of your investments took a 90 to 95 percent hit. And by the time the costs of management and later selling costs are paid out, every penny will have been taken. That, Doctor Hamblen, appears to be part of the scripted plan.

Lest this missive turn into a book, I'd like to switch gears and go to the document that is going before the Court on June 21. Citing just a few sections should go a long way toward supporting this thesis. I apologize if I wander around -- synopsizing this much paperwork into a single report is no easy task. And synopsizing THIS paperwork is, for me (one who has decades of forensic investigative experience searching haystacks for needles), very close to impossible. The very idea of an "average senior citizen" being able to wade through this mumbo-jumbo is well beyond impossible.

Buried in this document is a little tidbit about how Clayton Mortgage will be paid $28,938 by the "Parent Company" when this bankruptcy action gets consummated and the note is "restructured" via C-SWDE348 LLC. It is either unclear or weighed down with so much verbiage that Joe Average will never get through it, is the Parent Company Ritter or Southwest Desert Equities (SWDE) or the Focus Group, all of whom are inter tangled throughout

However, it's the Parent who is required to contribute. My own guess, and despite my experience that's all it really is, is that it appears to be SWDE, and that the real purpose is to remove the "infected" parts by transferring them to new LLCs that will then be in place for some further -- and fully fatal -- blood letting. When counsel for SWDE refers to "the parent of the debtor," the investor is left to try to figure out who is who. Going the additional step and figuring out the financial relationship and how it translates to the guarantees given to the investors is a sure trip into the Twilight Zone. These documents are replete with "players" and nothing is clear to the "average man." Who is the parent and who is the child, and why the analogy? In all of my conversations, I have yet to speak to a single investor who has any clue of what the Big Picture is in this mess. Not one.

I. Scott Bogatz is counsel for the debtor and debtor in possession. Even after multiple trips to the Bankruptcy hearings, I am not entirely clear about the differentiation between Focus Group and SWDE. My own visual representation is that the SWDE body was set up so as to be nearly severed when the time came. Cut off the arm to save the body.

The convoluted paperwork states "The Parent of the Debtor is required to put up $136,027, as a B class debtor of the "upfront payment." Specifically, the class B upfront payment shall be used by the debtor to pay the following. Real property taxes attributable to the property from 10/31/09 to 12/31/11, also management fees due under the new operating agreement." I find this paragraph to be a frightening open door toward potential continued raping/pillaging of the village. It makes no sense as the new operating agreement is not even yet in existence; however it grants the right to the new manager (Mr. Ritter?) to pay "Fees and expenses" previously incurred by Clayton Mortgage in connection with enforcement of the note and related loan documents." What expense does this include? Not only is it interpretive at best, it strikes me as the granting of a blank check. One that demands zero accountability.

The paperwork continues: "Of that money, $76,056 shall be deemed to constitute the Class B member initial capital contribution." Again, I am not clear, although my interpretation is that it means that the interest (we'll get into that hornet's nest in a moment) starts adding up on this amount instantly and when the property eventually sells, this is one of the first liabilities paid off.

The paperwork also refers to a NV revised statute 645B.340 which has to do with 51 percent of the people, but no where is this 51% defined. Since this plays a large part is releasing both signatories of the various personal guarantees, mightn't one reasonably expect full disclosure of what this encompasses? This is to get rid of the guarantors position. At the meetings staged by the Clayton Mortgage people to "explain" and "update" and "PROMOTE" this bankruptcy/LLC plan, the message was unclear at best. It was purposefully unclear at worst. And since we do not have any clue who is who or what the intent of the creative writing might be, the construction of this agreement is like wading through quicksand.

Another bottomless pit is the lack of any word construction addressing the change of status from a loan, which has certain legal rights, to an ownership position, which has totally different rights and responsibilities. was it stated the actually changes. Does one single person understand, automatically, what is involved? I think not. What I do think is that there is a fiduciary responsibility that has been ignored -- when it is to a profit takers interest.

The most frightening aspect of this entire agreement is as follows: "The parent (the current holder of the equity in the debtor) will be issued Class B membership interest upon the payment of the Class B parent up front payment. The debtor's new manager, which is an affiliate of Clayton, the servicer of the note, with assistance of the parent and developer, will continue to develop the community and entitle the property, but all costs incurred in connection therewith, including the carrier cost of the property, will be paid by the debtor thru voluntary additional capital contributions made by the lenders or otherwise borrowed from a third party."

"OR OTHERWISE BORROWED FROM A THIRD PARTY."

While I don't want to infuse this status update with text talk, the only appropriate comment I have about this is "OMG." Why? Because the final letting of the blood, or in this case the remaining money, will predictably be accomplished via the references and definitions of Class A and Class B groups. You'll find that explanation in the operating agreement, but it is incomprehensible to Joe Average. (Remember, please, that Joe Average is 65-80 years old and being bombarded by boxes and boxes of white paper mumbo-jumbo.)

Let's take a worst case scenario. At the rate of 8%, 12% (or combining them to get a 20% APR in today's 1% banking world), it is entirely possible/ probable that every last bit of blood will be siphoned off before the fully dehydrated body/bones are dropped on investors doorsteps along with a final distribution letter that reads, "Oops, nothing left for YOU." In the case at hand, the "worst case" WILL happen. Why give back anything when it can contractually, via this "Operating Agreement," be taken in full by agreed to fees?

All disseminated information has been accomplished by Clayton Mortgage, in their language, with their chosen inclusions and exclusions. Despite at least EIGHT VISITS to their offices (each one of which resulted in a different excuse or stall), you were unable to get any addresses or system of communication between the investors. Clayton refused, over and over, never releasing any useful information that would allow you to contact fellow investors before the deciding vote was taken. You have statements from some individuals who

wrote letters and said "release our information." Even those names would not be shared until well after the voting deadlines. This is a massive cause for both concern and suspicion. Were the Clayton people indeed concerned with protecting individual privacy? What do YOU think?

In a visit to the office of I, Scott Bogatz, conveniently located in the Focus Building, I heard you ask for the results of the voting of the 240 investors. You requested to know who voted, who did not, how many yes and how many no. That was never released. So now this Operating Agreement is going forth through a Court System that (I am sure) was not set up by our government for the purpose of financial manipulations and what is in essence loan modifications ... and no investor is privy to knowing how many people actually participated in the voting, what the vote really was, or if the voting procedure included any assurances what so ever of INTEGRITY within the process.

More scary wording: "Under the new operating agreement the debtor will be managed by an affiliate of Clayton Mortgage. Although the manager must seek approval of all budgets and business plans from the steering committee, the manager otherwise will have wide latitude of managing the debtor notwithstanding the preferences of the lenders. (The Steering Committee approves the budget and BP and other than that, Clayton Mortgage will implement according to whatever rules they care to introduce.) Whereas some parts of the contract are so full of words that one cannot begin to understand, other parts are wholly interpretive and I doubt it will be to the benefit of any of the investors.

Further, "the new operating agreement permits the Steering Committee to authorize the sale of the property without the consent of the holders of the Class A membership interest if (A) the sale will produce sufficient net proceeds to return all the additional member contributions and supplemental capital contributions along with the required return thereon, and (B) such sale for market value as determined by a MAI authorized appraiser. Accordingly the property may be sold under those circumstances without direct consent of the lenders and over the objection of any individual lender.

Again, OMG. This is where the 8, 12 and 20 percentiles come into play. When the blood runs dry, the carcass can be discarded "without direct consent of the lenders and over the objection of any individual lender." BY CONTRACT being entered into as part of this June 21, 2011 proceeding that NOBODY obviously understands..

Here's the current wording; "<u>If the lenders holding class A membership interests are unwilling to fund the carrying cost of the property, the debtor may, subject to the terms of the new operating agreement, seek financing to pay such costs and may secure such financing with the property. Therefore the lender providing such financing may foreclose upon the property if the debtor is unable to meet its obligations to such a lender</u>.

This language allows a complete bleeding of the turnip ... with final death when the turnip stops "producing."

At the end of the paperwork for this particular loan, Exhibit B Disclosure Statement outlines and "compares" the two options offered to the voters.

The first option, Chapter 7 is Valemount Capital's estimate of the present value for the 44 acres at $445,200 - $667,800. Subject to commissions and trustee fees, etc.

*However, earlier in this same report (Disclosure Statement Section XV. Liquidation Analysis, Page 30) Valemount Capital estimates the "rapid liquidation" value at $445,200 "and" $667,800 for the 44 acres. Subject to commissions and trustee fees, etc. (There is no explanation of the term "rapid liquidation.")*

How does Joe Average understand "**and**?" My assumption is that "and" means "between." Somehow, in the space of a 70+ page document, two to four million dollars has come up "missing."

The second option on Exhibit B, is Valemount Capital's speculation that if the property is held for 5-7 years, it would draw **$12,5112.546 to $17,498,786**. with a postscript regarding carrying cost,s fees, commissions, closing costs etc.

*However, again presented in this same paperwork, same Page 30, Valemount Capital speculates that if the property is held for 5-7 years the value would be $14,246,400 "and" $21,369,600. "a considerable increase in value"*

Why aren't both figures for Option #2 presented the same way so the investor can easily understand and compare in order to make his decision. And, the noteation "a considerable increase in value" seems unnecessary. Is it there only to persuade the investor? Lack of clarity destroys or at least hinders the investor from comparison and making an informed decision.

Another interesting side note: John Ritter is the manager. He signed, on 12/1/2010 as "John A, Ritter, Manager" of the new LLC. How is it possible that he was signing before this has gone through the program, the property had gone into his name and he had assumed the position of manager of the property? Who exactly is guarding the hen house?

Then we go to a section that's titled Plan of Reorganization. While there are a few complications, most of this is written in slightly better language ... except ... Release of Claims by Debtor Parties is unclear, convoluted, and it is near to impossible to ascertain what is or is not included. The language is such that anybody's grandmother's false teeth may be included. The result is SELECTIVE CONFUSION and wholly interpretive mumbo jumbo. This too is signed by John A. Ritter in his capacity as "the Manager."

The last section is the Operating Agreement (OA). There are multiple blank lines in the OA that could have been filled in because the information was known, but were left blank so that the people had no clue what was actually transpiring. Even if they had a Contracts PhD and COULD read this far. It's clear that the OA does define the conditions under which the LLC will be operated, but clearly favors the managers participation even with the steerage committee. It stipulates that 65% of vote would be required to change the OA and the manager has to do the mailing because of the inability, AGAIN, to have the addresses or some system of communication within the group of investors. (I find this to be intentional ISOLATION.) Example, if you wanted to get rid of the management company that is charging a rather stunning one half of one percent of the original loan amount and replace it with another company that might be willing to "manage" it at far less cost, the removal process would have to be handled by the management company that was currently in place. What's wrong with this scenario?

Doctor Hamblen, I could conceivably go on all night (and I have) relative to the multiple red flags of this fiasco of an Operating Agreement.

We opened this file on December 4, 2010 in response to your original inquiry. The assigned case number is referenced above. Given that the initial information included dealings in multiple states, a number of our investigative personnel throughout the Western US have taken part in trying to unravel the goings on. My understanding when this case was opened was that it was a single investment group with a somewhat small loss cap. I could not have been more in error. We have dubbed it "Mini Madoff" among ourselves because the layers of "questionability" appear to be without end. We've called in expert help from Federal, State and Local authorities, financial analysts, Certified Fraud Examiners, and sought guidance from pro bono attorneys who are familiar with "questionable" financial dealings within the mortgage and real estate markets.

Since December, I have relied upon the review of copious amounts of copies of forwarded documents (from you and from other victims involved in these same groups) and upon my own observations at three investor meetings and two hearings in the Federal Building in Las Vegas. I was also present at a restaurant meeting with attorney I. Scott Bogatz, counsel of record for the Focus companies and a series of personal meetings with a representative of Clayton Mortgage. In every case of interaction, you were also present and my true association with the Fight Fraud America organization was not divulged to the Focus/Southwest Desert

Equities and Clayton representatives at the meetings. Our M.O is to walk in quietly -- without a big stick -- and listen.

My opinion after all of this -- one shared by every other investigator who has reviewed aspects of it -- is that the history of your multiple involvements with Clayton Mortgage Company loans was one of intentional misrepresentation from the onset, wild speculation to produce some numbers and fancy dances to suppress other numbers, a series of manipulative evasions of truth, production of misleading "documents" on an as needed basis, and the use of confusing letters, updates, proposals and contracts that approach/cross over into (again, in my opinion) the realm of criminal.

Again, I stress that I am NOT an attorney. You, the "collective you," need legal representation, however it is fully apparent that one of the reasons for the "fragmentation" that has transpired in these investment groups was an INTENTIONAL ACT so as to make it impossible for fellow investors to locate one another and pool resources to fund the services of a capable attorney. At this moment all of your individual money is in the hands of those who will use it to hire their own attorneys ... "possession is 9/10ths of the law" ... and push this piece of rubbish of an "Operating Agreement" through a Court System that is being abused by this process.

You are a smart man, however the reality is that the bad guys have pushed you, through a series of calculated moves designed to benefit them and NOT you, into a very difficult corner. The IRS-CID has done an intake report as a result of the possibility of tax "irregularities" and is reviewing the file now. The FBI and the Metro Fraud Unit have reports from various investors, however a multi BILLION dollar investigation in a very defined area of the law that few are familiar with may prove problematic. Two powerful national media units are also considering coverage, but that is admittedly a long shot in light of it being impossible to "top" the Madoff stories.

Here is my NON ATTORNEY ADVICE to you. I suggest that you file the necessary paperwork by the June 1, 2011 deadline, that's TOMORROW, that will allow you to address the Court on June 21, 2011 and hopefully POSTPONE any finality until you can get the Court to understand the "fragmentation issue" and assist you in trying to contact/organize as many as possible of the 3,000 people who have been destroyed by these suspected shenanigans.

I will be able to supply you with a connection to another massive lending Ponzi that extends this matter to 17 states. I can have that information to you by next week. If luck and justice is on your side, it is possible that the judge will then see that Mortgage and Investment "misrepresentations" are destroying the fabric of this nation and the STOP has got to START somewhere. Maybe that somewhere can be Las Vegas?

Please let me know if you to proceed. We will assist to our full ability. This entire case and the damage it has done to so many innocent people NEEDS to be heard. Hopefully the judge will recognize that


Leslie Kim, Executive Director

www.fightfraudamerica.com