**E-FILED on June 14, 2011**

I. SCOTT BOGATZ, ESQ.
Nevada Bar No. 3367
CRAIG F. ROBINSON, ESQ.
Nevada Bar No. 10205
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7900
Attorneys for Debtor and Debtor-in-Possession,
C-SWDE348, LLC

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>C-SWDE348, LLC, a Nevada limited liability company,<br><br>Debtor and Debtor-in-Possession. | Case No.:  11-13942-MKN<br>Chapter 11<br><br>**DEBTOR'S RESPONSE TO OBJECTION TO CONFIRMATION OF CHAPTER 11 BANKRUPTCY PLAN, FILED JUNE 1, 2011**<br><br>Date of Hearing:  June 21, 2011<br>Time of Hearing:  1:30 p.m. |

**TO THE HONORABLE MIKE K. NAKAGAWA, UNITED STATES BANKRUPTCY JUDGE:**

C-SWDE348, LLC, a Nevada limited liability company, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby files this Response to the *Objection To Confirmation of Chapter 11 Bankruptcy Plan*, filed June 1, 2011 [Docket No. 42] (the "Objection"). In support of the response, the Debtor submits the Declaration Of I. Scott Bogatz, Esq., In Support Of Debtor's Response To Objection To Confirmation Of Chapter 11 Bankruptcy Plan, Filed June 1, 2011 (the "Bogatz Declaration"), and the Declaration Of Amanda Dalton In Support Of Debtor's Response To Objection To Confirmation Of Chapter 11

Bankruptcy Plan, Filed June 1, 2011 (the "Dalton Declaration"), each filed concurrently herewith, and respectfully represents:, and respectfully represents as follows:[1]

## I. PRELIMINARY STATEMENT.

The June 1, 2011, Objection, as jointly filed by some of the Lenders (who combined own less than 1.5% of the beneficial interest in the Note) sets forth a number of issues that Debtor now responds to in turn. The Debtor notes that the Objection is submitted by Dr. Robert Hamblen, Donna Durkin, and Michelle Achiardi. Both Dr. Hamblen and Ms. Achiardi are Lenders in this action. However, the Debtor can find no evidence that Ms. Durkin is a Lender herein. Ms. Durkin is, however, a lender in other loans related to the Focus Property Group family of entities.

The Objection appears to incorporate a document which purports to be a June 1, 2011, e-mail from "Fight Fraud America" attached to the Objection. Notably, Objection appears to primarily take issue with the alleged representations made by the Servicer to the Lenders at the time the Note was executed, in which the Parent (and the Debtor) were not directly involved.

The Debtor understands that the objecting Lenders are not represented by counsel. In an attempt to address the objecting Lenders concerns contained in the Objection, the Debtor has, in this document, attempted to distill the documents into identifiable objections and then respond to each in turn, as follows:[2]

---

[1] Terms utilized herein, but not defined herein, shall have the meanings ascribed to such terms in the Plan.

[2] It should be noted that many discussions have been held with the objecting Lenders and Ms. Durkin in an attempt to work through their concerns. Specifically, counsel for Debtor meet with the objecting Lenders and Ms. Durkin initially for approximately two hours. Recently, the objecting Lenders and Ms. Durkin met for another approximately two hours with the Guarantor of the loans, John A. Ritter, the Chief Operating Officer of the Debtor, Thomas J. DeVore, and counsel for the Debtor. In addition, the objecting Lenders and Ms. Durkin have attended the 341 hearings for the Debtor and several related debtors and actively participated in those hearings along with counsel for the United States Trustee. *See* Bogatz Declaration.

BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
(702) 776-7000 FAX: (702) 776-7800

**II. ARGUMENT.**

    **A. THE VALUE OF THE PROPERTY AS ALLEGEDLY STATED BY THE SERVICER TO THE LENDERS DOES NOT OFFER GROUNDS FOR DENYING CONFIRMATION.**

The Objection's first issue raised hinges upon the complaint that, while the Parent purchased the Property in March 2004 for $2,226,000, the Servicer thereafter allegedly represented the value of the Property to be somewhere in the range of $18 million to $20 million in or about 2006. *See* Objection, at p. 1. These 2006 values were supported by appraisals, which appraisals were apparently provided to the Lenders by the Servicer. *Id.* The Objection asserts that "[m]onies from that investment pot over and above the cost of the land were said to be used to purchase additional parcels of land." *Id.* at p. 2.

It is not clear how these statements constitute an objection to the Plan. Nonetheless, the circumstances surrounding the Objection's comments on this point are as follows:

At its height, the Parent of the Debtor, Southwest Desert Equities, LLC (the "Parent"), owned approximately 100 parcels of land located in Nevada, California and Arizona. *See* Dalton Declaration. Almost all of the land was pledged as security for over 55 loans from various mortgage companies, banks and other financial institutions, totaling over $165 million in principal amount. *Id.* When land was either sold for amounts above the debt associated with those parcels, or loans were refinanced for amounts in excess of the original purchase price of the land (as occurred with the parcels at issue), the excess funds would be used for the operations of the Parent, including payment of interest on its outstanding debt, property taxes, entitlement and pre-development work, as well as for the purchase of additional parcels of land as noted in the Objection. *Id.* In addition, funds from the Parent were paid or distributed/contributed to cover the Parent's portion of other operational expenses and business uses for the Focus Property Group family of entities. *Id.*

Notably, when the events occurred that ultimately lead to the current Chapter 11 proceeding of the Debtor, all of the loans of the Parent went into default. *Id.* Some form of resolution has been reached or is being sought for each of these loans, including joint venture agreements achievable without the need for a bankruptcy filing, foreclosures, deeds in lieu, and

1 pre-packaged plans of reorganization filed by other newly formed entities under other Chapter 11
2 proceedings. *Id.*

3 Finally, in each instance that a refinancing occurred from a prior loan (as is the case with
4 the loan at issue in this proceeding), the mortgage company, bank or other financial institution
5 obtained its own appraisal and determined what percentage of loan to value it was willing to lend
6 for the refinance. *Id.*

**B. THE OBJECTION'S CONCERNS RELATING TO RELEASE OF GUARANTOR CLAIMS ARE NOT SUFFICIENT TO DENY CONFIRMATION.**

9 The Objection appears to raise an issue with the release of the Guarantor Claims by the
10 accepting Lenders, stating that "[t]he paperwork also refers to a NV revised statute 645B.340
11 which has to do with 51 percent of the people, but no where is this 51% defined." *See* Objection,
12 at p. 3. At a later point, the Objection argues that the section of the Plan concerning "Release of
13 Claims by Debtors is unclear, convoluted, and is nearly impossible to ascertain what is or not
14 included." *Id.*, at p. 5. It is presumed that the Objection is, in fact, referencing Section 5.8 of the
15 Plan, entitled "Release Of Claims By Releasing Lenders."

16 As the Court is aware, the Plan calls for the ***approving*** Lender's release of all claims
17 against the "Debtor, any other obligors under the Note, the Guarantor, any obligors under the any
18 other guarantees of the Note (if any) . . . arising out of or in any way related to the Note, the
19 Guarantee, any other guarantees of the Note or the Property . . ." *See* Plan, § 5.8. The Plan also
20 includes a reciprocal release by the Debtor Parties, as the term is defined in Section 5.8 of the
21 Plan (and which includes the Debtor and the Guarantors). As neither Dr. Hamblen nor Ms.
22 Achiardi, as Lenders, voted in favor of the Plan, confirmation does not prejudice any claims that
23 they may wish to assert against the Debtor, Guarantors, Servicer, etc.

24 However, the 51% language discussed relates to NRS 645B.340, which – as expressly set
25 forth in the Disclosure Statement – "provides, among other things, that, in such cases [where the
26 Note is held by more than one natural person], persons holding 51% or more of the beneficial
27 interests in a note may be able to bind the remaining holders to a release of any or all of the

BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
(702) 776-7000 FAX: (702) 776-7800

obligations relating to such note." *See* Disclosure Statement, at 11:21-12:11. The Disclosure Statement continues to explain that:

> [h]ere, if Lenders holding more than 51% of the beneficial interests in the Note accept the Plan and release the Guarantor, the Nevada Statute may permit the Debtor and Guarantor to argue that the releases contained in the Plan are binding upon all of the Lenders, including those that did not accept the Plan. There is no guarantee that 51% of the beneficial interests in the Note will vote in favor of the Plan and, even if that is the case, the Plan does not affect and the Bankruptcy Court will not adjudicate any rights that the Debtor, the Guarantor or the Lenders may have under the Nevada Statute. Accordingly, any determination of whether the Nevada Statute binds the Lenders that did not accept the Plan to releases will be determined, if necessary, in a forum other than the Bankruptcy Court, most likely in a Nevada state court. The substance of any such determination is unclear and cannot be predicted with certainty.

*Id.* Accordingly, the Disclosure Statement clearly and succinctly sets forth a description of the potential interplay between NRS 645B.340 and Lender voting. Further, the Disclosure Statement defines the 51% to be "51% of the beneficial interests in the Note." *Id.*

Here, neither Dr. Hamblen nor Ms. Achiardi, as Lenders, voted in favor of the Plan, and therefore have not directly waived any rights against the Guarantors. However, the Disclosure Statement is intended to inform all of the Lenders that Nevada law *may* be interpreted to hold that acceptance by 51% of the beneficial interests of the other Lenders may operate as a release by Dr. Hamblen's and/or Ms. Achiardi's potential claims against the Guarantors. To Debtor's knowledge, NRS 645B.340 is untested before the Supreme Court of Nevada; and, accordingly, Debtor included language in the Disclosure Statement that "[t]he substance of any such determination is unclear and cannot be predicted with certainty." *See* Disclosure Statement, at 12:10-11.

The Debtor submits that the Disclosure Statement sets forth a full and complete description of the potential application of NRS 645B.340, but also clearly states that "the Plan does not affect and the Bankruptcy Court will not adjudicate any rights the Debtor, the Guarantors or the Lenders may have under the Nevada Statute". *Id.*

### C. THERE IS NO GENUINE CONCERN OVER THE TABULATION OF LENDER VOTING.

The Objection voices concern that the Lenders have not been provided with the addresses or other contact information for other Lenders, arguing that "Clayton [Servicer] refused, over and over, never releasing any useful information that would allow you [Dr. Hamblen] that would allow you to contact fellow investors before the deciding vote was taken." *See* Objection, at p. 3. The Objection raises further concern over disclosure of "who voted, who did not, how many yes and how many no." *Id.*, at p. 4. The Objection posits that "[t]his is a massive cause for both concern and suspicion." *Id.*

The Debtor, in its prior "Motion For Entry Of An Order (A) Approving Stipulated Confidentiality Agreement, (B) Scheduling A Combined Hearing On The Adequacy Of The Disclosure Statement And Confirmation Of Prepackaged Plan Of Reorganization, (C) Approving Procedures For Filing Objections Thereto, And (D) Approving The Form And Manner Of Notice Of The Combined Hearing" (the "Scheduling Motion") [Docket 16], explained to the Court that:

> Due to privacy and other concerns, the Servicer prefers not to make the addresses of the Lenders public. Accordingly, the Debtor and the Servicer propose to enter into a stipulation in the form of Exhibit A. Pursuant to such stipulation, the Servicer will lodge a list (the "Service List") containing the names and addresses of the Lenders with the Court under seal and provide a copy to the Debtor. The Debtor will then mail notice of the Combined Hearing directly to the Lenders and will file a proof of service listing the names of the Lenders as well as a statement that the Debtor has served each Lender at the corresponding address set forth on the Service List. The Debtor believes that the aforementioned procedures are appropriate under the circumstances.

*See* Scheduling Motion, at 8:16-24. Accordingly, it was the Server who desired the maintain the privacy of the Lenders, and the Debtor has honored that concern by specifically seeking approval of a mechanism to maintain the Lenders' privacy.

Nonetheless, the identity of the Lenders has not been kept secret from the other Lenders, as the creditor matrix on file herein identifies each Lender by name. The confidentiality of the individual Lender addresses has been maintained through the Service List filed under seal. Further, the Debtor of course will bring the original Lender ballots received during the Solicitation, which will be available for review by the objecting Lenders and the Trustee should

there be any issues concerning ballot tabulation. Notwithstanding, the Debtor also filed a Certification of Acceptance and Rejection of Debtor's Plan of Reorganization Dated December 1, 2010 (Ballot Summary) filed on March 21, 2011 [Docket No. 8], which certifies the results of the solicitation, and which is also summarized hereinabove.

As such, the Debtor believes it has provided sufficient information concerning the identity of the Lenders and the results of the solicitation, while preserving the confidential concerns of the Lenders and the Servicer in the process.

### D. THE CLASS B MEMBER'S INITIAL CONTRIBUTION DOES NOT HAVE INAPPROPRIATE PRIORITY OVER THE CLASS A MEMBERS.

Pursuant to the Plan, the Class B Member (the Parent) will contribute $136,027 in new money as the Class B Member Upfront Payment, which is an amount estimated to be sufficient to pay certain costs pertaining the Property through the end of this year. *See* Disclosure Statement, at p. 9. Of that amount, only $76,056 shall be considered the Class B Member Initial Contribution, to which the Class B Member is entitled to return along with interest (with the remaining amount of the Class B Member Upfront Payment not returned to the Class B Member at any time). The purpose of the Class B Member Upfront Payment is to sustain the Debtor's costs for the Property through the end of this year, thereby acting to alleviate the potential need for Additional Capital Contributions through the end of 2011 (notably, the Class B Member Upfront Payment is reasonably estimated but not guaranteed to cover such costs).

The Objection argues that the Class B Member's (the Parent) initial capital contribution "is one of the first liabilities paid off." *See* Objection, at p. 3. In fact, all Supplemental Capital Contributions made by the Class A and/or Class B Members to the Debtor as needed during the course of Debtor's business, plus interest, have first priority at the time of distributions. *See* Plan, at § 5.2. As set forth in the Plan, Supplemental Capital Contributions are those amounts paid by the Class A or Class B Members to cover the shortfall of Members who do not contribute at the time of a capital call. *Id.* Once the Supplemental Capital Contributions and accrued interest are repaid, then the Plan calls for distributions to the Members as reimbursement for their Additional Capital Contributions, along with repayment of the Class B Member Initial

Contribution, together with accrued interest. *Id.* After the Additional Capital Contributions and the Class B Member Initial Contribution are repaid with interest, the Plan calls for 90% of the funds to be distributed to the Class A Members (including those that have not made any Additional or Supplemental Capital Contributions) until all of the Class A Members have received their Initial Capital Contribution (equal to their beneficial interest in the Note) plus interest. *Id.* Finally, any funds remaining for distribution shall be distributed 70% to the Class A Members and 30% to the Class B Member. *Id.*

The Debtor believes that this mechanism provides a fair and balanced means for the Debtor to obtain additional capital as needed in the future by providing incentives to those Members who elect to inject additional funds for the benefit of the Debtor. The Plan also provides incentive for the Parent to inject funds into the Debtor at the onset and for the benefit of all of the Lenders (Class A Members), providing for a return to the Parent (Class B Member) of some of those funds in the future. The Debtor further notes that this mechanism was approved by an overwhelming percentage of the Lenders as being reasonable and fully disclosed in the Disclosure Statement.

### E. ANY SALE RESULTING IN A MINIMUM DISTRIBUTION WILL RETURN TO THE CLASS A MEMBERS ALL OF THEIR INITIAL CAPITAL CONTRIBUTION.

The Objection takes an erroneous view of the Plan's provision concerning any sale of the Property resulting in a Minimum Distribution, as defined in the New Operating Agreement attached to the Plan. Specifically, the Objection states that the Steering Committee may sell the Property without vote of the Class A Members and, as a result thereof, deprive the Class A Members of any return of their Initial Capital Contribution. *See* Objection, at p. 4. Although the Debtor understands how the objecting Lenders could be confused on this point, it is not accurate under the Plan.

The New Operating Agreement defines the term "Minimum Distribution" as follows:

> . . . Any sale of the Property which will result in a Minimum Distribution (as defined below) may be approved by the Steering Committee, if requested by the Manager, without the necessity of a vote of the Class A Members provided that the sale price is not less than the fair market value of the Property as determined by an independent M.A.I. appraiser selected by the Manager and paid for by the

Company. As used herein, a "**Minimum Distribution**" shall mean a total distribution to the Members of an amount that will return to the Class A Members all Additional Member Contributions and Supplemental Capital Contributions, together with all interest thereon as provided herein, ***and an amount equal to at least the Original Principal Loan Amount, as may be applicable.***

*See* Plan, at "Exhibit A," § 3.7(c) (emphasis added). Accordingly, the Steering Committee is entitled to sell the Property without the vote of the Class A Members, but only where the sale price will return to the Class A Members all of their contributions – including Initial, Additional, and Supplemental Contributions. Thus, such a sale may only be accomplished where the Class A Members (such as Dr. Hamblen and Ms. Achiardi) receive a full return of their principal investment in the Note.

After having meet with the objecting Lenders, the source of the confusion became clear. In Section XIV of the Disclosure Statement, the Debtor lists Risk Factors related to the Plan. The fourth bullet point under the Risk Factors relates to a sale approved by the Steering Committee summarizing the applicable section of the New Operating Agreement. By a clerical mistake, however, the bullet point omits that one condition is that the sale is sufficient for the recoupment of the Lenders initial loan (the Initial Capital Contribution, as defined in the New Operating Agreement). The Debtor submits that this clerical error is not material. If anything, the result of the error has the effect of overstating the risk, not understating it. In addition, the Disclosure Statement states that any incongruity between the summaries contained in the Disclosure Statement and the Plan (which incorporates the New Operating Agreement) is controlled by the Plan. *See* Plan, at p. 2.

**F.    THE VALEMOUNT CAPITAL VALUE ESTIMATES SET FORTH IN THE PLAN ARE CLEAR AND ACCURATE.**

The Objection incorrectly asserts that the comparative figures provided by the Debtor in relation to a Chapter 7 liquidation versus Chapter 11 reorganization are inaccurate. *See* Objection, at p. 4-5. In fact, there is no discrepancy in these figures.

"Exhibit B" of the Disclosure Statement presents the Debtor's liquidation analysis, and states that a current liquidation sale of the Property would generate values of $445,200 - $667,800. *See* Disclosure Statement, at "Exhibit B." Section XV of the Disclosure Statement –

1 entitled "Liquidation Analysis" – makes the same statement that "rapid liquidation of the Property in a chapter 7 would generate values equal to between $445,200 and $667,800." *Id.*, at p. 30.

"Exhibit B" of the Disclosure Statement also states that the Lenders may anticipate distributions under the Plan of $12,512,546 - $17,498,786 if the Property is held by the Debtor, as anticipated by the Plan, and taking into account the payment of carrying costs and the cost of the sale of the property. *Id.*, at "Exhibit B;" *see also Id.*, at "Exhibit B, " n. 1. These values are estimated based upon Valemount's estimation "that the price of the Property, if properly marketed and held over the next five to seven years, would be between $14,246,400 and $21,369,600 . . ." *Id.*, at p. 30.

Thus, there is no "lack of clarity," as argued in the Objection, nor is there any intent to "hinder[] the investor from comparison and making an informed decision." *See* Objection, at p. 5. Exemplifying this, the Plan was approved by an overwhelming majority of Lenders who cast votes.

## III. CONCLUSION

For the forgoing reasons, the Debtor respectfully requests that the Court enter an order finding that the Disclosure Statement contains adequate information and confirming the Plan. The Debtor further requests that the Court enter an order denying the Objection.

Dated: June 14, 2011

I. SCOTT BOGATZ, ESQ.
Nevada Bar No. 3367
CRAIG F. ROBINSON, ESQ.
Nevada Bar No. 10205
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7900

/s/ I. Scott Bogatz
*Attorneys for Debtor and Debtor-in-Possession*
*C-SWDE348, LLC*

BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
(702) 776-7000 FAX: (702) 776-7800